## SUPREME COURT—IN ADMIRALTY.

### J. SHIRLEY *vs.* BARK "ITALY."

AN error of judgment in not properly securing a whale which had been killed and anchored in the ice on the part of an officer of a whaleship, is not such a dereliction of duty as will warrant a forfeiture of wages.

It is not every slight act of disobedience which will authorize such a penalty, but the Court must be satisfied that the seaman has been reckless and faithless in his duties and exhibited a habitual disregard for the interests of the voyage.

ALLEN, C. J.

This is a libel for a lay or share in a whaling voyage, in the nature of seaman's wages. It is alleged that the libellant, in January last, shipped in Honolulu, as third mate on the American bark "Italy," for a whaling voyage to the northern seas for the season, at a lay of one forty-fifth (45th), to be discharged here ; that the voyage was performed and the ship returned to this port with 1,180 barrels of oil and 15,803 pounds of bone, and that he is entitled by the shipping articles to his lay as aforesaid on said amount of oil and bone, at the prices fixed at the United States Consulate, which is 32 cents per gallon for oil and 50 cents per pound for bone, but that the said respondents refused to settle and pay him according to the terms of the said contract.

There was a special answer put in by the owners, in which they admit that the said libellant shipped and served as third officer on said bark, and performed a whaling voyage to the northern seas on the terms specified, and that the said bark brought to this port the quantity of oil and bone alleged.

They further answer that an advance of $115 was paid to said Shirley, and that he has forfeited all right and claim to any lay or share in the catchings and savings of said bark, because he disobeyed the orders of his superior officers and failed to perform his duty, in consequence of which a whale which had been captured and killed in Shantar Bay, in the Ochotsk Sea, which respondents allege would have yielded fifty barrels of oil and the usual proportion of bone, was lost to the said bark, and that the value thereof, which is rightfully chargeable against the respondents far exceeds the amount claimed by him as his lay or wages on said bark, which after deducting his said advance and interest thereon and the other usual charges, would amount to a comparatively small sum of money.

By the contract the seaman is to give his time and exertions to the best interests of the voyage ; he is bound to obey all lawful commands, and it is a principle of law that whatever amounts

to a breach of the contract will affect his claim for wages. In cases of an aggravated nature, where there has been an entire breach of the contract, a total forfeiture of wages may very properly be decreed. Still, as has been wisely said in the case of the ship "Mentor," by Chief Justice Story : "Those judges in our Courts, who have been called most frequently to administer this branch of the law, have certainly not felt themselves bound to inflict the forfeiture of wages for slight misbehavior, whether by disobedience or negligence."

I certainly should regard a determined disobedience of orders as worthy of being treated with severity.

In this case the counsel for the defense contend that the libellant has forfeited his wages by not taking care of the whale, as ordered, and that at least he should have ordered one boat to have remained by the whale during the night. The testimony is, that in the month of July last, in Shantar Bay, a whale was taken and killed by the first officer and men of the schooner "E. L. Frost," tender to the bark "Italy," and the 4th mate of the bark; and, soon after, the libellant and the first officer of the "Italy" came up, each in his own boat, and the four boats towed the whale out of the ice, but as the tide had turned, they were forced to anchor the whale, which was near sundown. The libellant was asked by the first officer if he was willing to remain by the whale with Mr. Melville, the fourth mate ; he replied that he was willing to do anything for the benefit of the voyage, and he would do so ; whereupon the first officer of the bark and the first officer of the tender went on shore.

It appears in evidence by the testimony of the respondents, that after they had been by the whale some three or four hours, they hauled the whale to the surface of the water, but as they could not take the anchor, the tide turned and took the whale down again, and the anchor sunk the whale a second time. Shirley and Melville tried to get the anchor, but as the tide run so fast they could not do it. A witness of respondents, who was a boatsteerer in the fourth mate's boat, says they should have had a tripping line bent to the anchor when the whale was first anchored, and still he thinks if they had cut the line it would have saved the whale. Shirley and Melville remained a short time after by the whale, and then went on shore for refresh-

ment, which was variously estimated from eight to twelve miles. The men had been all day in the boats and were cold and fatigued. It appears that they remained on shore but a short time, and returned to secure the whale, but they could not find him.

The same witness says : " We had the bearings of the whale ; all we could have done was to have laid by until the tide turned again in six hours ; one boat could have stayed by the whale, although one could not steer the whale ; the drag might have been carried off by the ice ; the whale first sunk when the tide was running out, and afterwards when the tide was running in, and then we should have waited until the next slack tide to work on him ; the flood that was then making would bring the ice back into the bay, and it would be after daybreak before the next slack tide, as I remember it now ; the ice as it came back would have been dangerous to the boats if it was thick—if not, it would not ; the crew were natives, and are sometimes afraid of the ice ; I did not see anything to indicate that Mr. Shirley did not act to the best of his judgment."

It is not very unusual to anchor whales. The first officer of the bark says : " I have left whales myself before, but always when I knew where to find them ; I do not know of any custom to make a man forfeit his wages for leaving a whale." Shirley supposed he had left the whale where he could find him, for he took his bearings and returned to the place as soon as he could go on shore, get some refreshment and return. There was no delay, no shirking of duty. The fourth mate of the bark says : " That he thought that on their return, it would be slack tide, the whale would have risen and been fast to his anchor ; we acted to the best of our judgment."

In the case of Drysdale vs. schooner " Ranger," Bee's Reports, 148, it is decided that wages are not always forfeited by disobedience of a captain's orders, unattended by aggravating circumstances. The laws of Oleran declare " that if a mariner commit a fault, and do not submit, the master may, at the next place of landing, discharge him, and if he refuses to go on shore, he shall lose half his wages and all his goods in the vessel. But if the mariner submit, and the master will not receive his submission, he shall have his full wages." As a general

J. Shirley *v.* the Bark Italy.

principle this is regarded as sound law at this day, but each case rests on its own peculiar circumstances.  The mate of the bark testifies that he did not call Shirley to account for the loss of the whale, and there is no evidence that any complaint was made or even a question raised as to the propriety of Shirley's conduct at the time.  Indeed, the first officer of the bark says : " I did not call on Shirley to account for the whale ; I saw him the next day, and he said they had lost the whale and were looking for him."  Had these experienced first officers been as sensitive to their duty, as they are to the unsuccessful efforts of Shirley, would not one of them have remained by the whale and made their best efforts to secure him ?  It is not to be presumed that they would have left him, had he not been a uniformly discreet and faithful man ; and except in this instance there is no intimation that his conduct ever met with his officer's disapprobation.  It is not pretended that they were required on their vessels, but said, when they left Shirley and Melville, " we will go ashore and come off early in the morning and see if we cannot catch another whale."  It is in evidence by a witness of the respondents, " that a tripping line should have been bent to the anchor when the whale was first anchored." This precaution these experienced officers did not take—was this a neglect of duty for which they should suffer ?  I do not say that it is, although had they done it the chances of saving the whale would have been greater.  The witness further testifies that Shirley and Melville both tried to get the anchor out, but could not do it, and he thinks if they had cut the line they would have saved the whale, and the first officer of the tender is clearly of opinion that this would have saved him. They may have spent too much time in trying to get the anchor, when they should have cut the line at once and left the anchor. At the instant Shirley and the officer with him thought differently, and it is very clear that they acted according to their best judgment under the circumstances, and I am not at all satisfied that experienced whalemen would have acted otherwise.  It is very easy for one to say what he would have done in a given situation, but place him there and it does not follow that he would have been of the same opinion.  Shirley continued in the faithful discharge of his duty to the termination

Vol. ii.        18

of the voyage at this port.   There was no act of submission required, for no complaint was made, and hence it is the duty of the Court to look with caution upon charges which work a forfeiture of wages, that are made long after the acts complained of have transpired.   The first officer of the bark reached the place when the first officer of the tender and the fourth officer of the bark had the whale dead, and he says, the libellant came along with him in his own boat—the whale was towed out of the ice by the four boats—they made no headway because the tide was so strong, and were forced to anchor it. In this state of the case, he says that "the ice was pretty strongly packed" and night coming on, "the sun was setting when we left the whale."   It perhaps would have been faithful and discreet for one of these first officers to have remained by the whale, as neither were required on board their vessels, so that the most that can be made reasonably of this is, that Shirley omitted to do what these first officers regarded it as his duty to have done, and therefore should suffer a forfeiture of his wages.

Still the first officer of the bark says, "that every man should use his own judgment when left by himself."   Why then should Shirley be subject to the forfeiture of his wages for following this rule of the officer who left him in charge of the whale ? Shirley exercised his own judgment in view of all the circumstances of the case.   He and his men had been in the boats all day till late at night, and they were cold, hungry and fatigued. He decided to go on shore and get refreshment and return in the morning, taking the bearings of the place where the whale was anchored.   Had he remained, it is very uncertain whether at the return of the tide, with the ice, the boats would have been able to have secured the whale.   Be this as it may, I do not regard it as disobedience, but the exercise of a discretion, strictly within the line of duty ; for no course of conduct was prescribed for him in view of contingencies.   The only act pointed out by the first officer was, when the tide turned, to take their anchor and tow the whale to the head of the bay. They could not take their anchor, and it is very questionable whether Shirley acted with more indiscretion in not cutting the line than these first officers did in not attaching a tripping

line to the anchor. He regarded it his duty to his men to go on shore and get some refreshment, and it appears that he remained on shore only time sufficient to get the refreshment and immediately returned to secure the whale ; but in this he was disappointed, and the whale was lost to the ship. On his return to the ship, he was not called to an account ; no complaint was made against him as there would have been, had‧ his conduct been regarded as a violation of his duty. It is not alleged but that he has been a faithful man and discharged his duty fully, except in this instance, and I cannot regard the conduct of this seaman so flagrant as to have incurred the forfeiture of his wages for the season. These persons in the boats were interested in the produce of the whale, to them as important for their share as to the owners, and there was no expression by any one that the course then taken by Shirley was one of doubtful expediency. Chief Justice Story, in the case of the ship " Mentor," 4th Mason 90, says that " it is not a‧single act of disobedience, or a single neglect of duty, which ordinarily carries with it so severe a penalty ; there must be a high and aggravated neglect or disobedience, imparting the most serious mischief, peril, or wrong ; a case calling for exemplary punishment and admitting of no reasonable mitigation ; a case involving a very gross breach of the stipulated contract for hire, and going in its character and consequences to the very essence of its provisions."

He says further, " I should be sorry to lay it down as a general proposition that any act of disobedience by a seaman, however slight, is of course to be visited with a forfeiture of wages, or will justify a master in dismissing him in the course of the voyage. Such a principle it seems to me would be disastrous to the commercial interests of the country and would involve so many difficulties in its application that the denial of wages would soon, from the necessity of the case, with reference to the ordinary habits of seamen, introduce an essentially different contract into maritime employment." An officer may forfeiᵗ his right to command by fraudulent, unfaithful and illegal practices ; by gross and repeated negligence, or flagrant, willful and unjustifiable disobedience (1 Peter's Ad., 247, Atkins *vs.* Barns.) Testing this case by these principles of the maritime law to

which I have adverted, and which are recognized by all the Courts of Admiralty in the United States, under whose flag the "Italy" sails, and to which, if in a home port, she must submit, I cannot decree a forfeiture of wages in whole or in part. When I can be satisfied from the facts of a case that a seaman had been reckless and faithless in his duties, and exhibited a habitual disregard for the interests of the voyage, I should regard it as a breach of the contract, and that a forfeiture of his wages in whole or in part, would be in conformity to the principles which control the decisions of a Court of Admiralty; and so with gross offenses, if persisted in without repentance and amends, they should be rigorously punished.

In this case it is not proved that there was any intentional dereliction of duty, any wanton neglect, or that he did not faithfully exercise his own best judgment, and under the circumstances, a sound judgment. Indeed, at the time no complaint was made, and I am inclined to the opinion if there had been that by the principle of condonation, which is so scrupulously incorporated into the Maritime Code, that Shirley's subsequent faithful performance of duty would have cured a total or partial forfeiture of his wages and reinstated him in all his rights.

I accordingly adjudge that the libellant is entitled to the amount of his lay as set forth in the libel, less the advance of $115, and shall direct the decree to be conformed thereto, with costs.

Mr. Harris, for libellant.

Mr. Montgomery, for respondents.